*781 SENTENCIA
Los peticionarios, Maranello, Inc. y Bird Interplan Development Group, LLC, mediante recursos de certiorari presentados separadamente, nos solicitan que revisemos la sentencia emitida el 31 de agosto de 2011 por el Tribunal de Apelaciones. Según este dictamen, el foro apelativo in-termedio confirmó y revocó en parte una determinación de la Oficina de Administración de los Tribunales (O.A.T.), que estableció el orden de preferencia entre nueve pro-puestas presentadas para la negociación y el desarrollo del Centro Judicial nuevo en Aibonito.
Los argumentos planteados por las partes tienen su ori-gen en el orden de preferencia adjudicado por la O.A.T. a los licitadores que respondieron a su Request for Proposal (RFP) para la construcción de las instalaciones nuevas del Centro Judicial de Aibonito. En esencia, debemos resolver si el orden de preferencia establecido por la O.A.T., según su expertise, respondió a un ejercicio razonable de discreción.
Por entender que así lo hizo, confirmamos la determina-ción del Tribunal de Apelaciones.
rH
La O.A.T. publicó un anuncio, el 26 de abril de 2009, mediante el cual extendió una invitación a las firmas y los proponentes interesados para desarrollar, construir y arrendar con opción a compra un nuevo edificio para alber-gar las instalaciones físicas del Centro Judicial Regional en el municipio de Aibonito. En el RFP se detallaron los requisitos y elementos básicos que debían incluirse en las propuestas. También se desglosaron los criterios para eva-luar los proyectos.
Entre los criterios se incluyeron aspectos tales como: *782 que el terreno debía tener acceso a la transportación pú-blica y a las vías principales que conectan los municipios que componen la Región Judicial de Aibonito. Además, se requirió que tuviera la capacidad de albergar el centro judicial nuevo y dos estacionamientos, uno para empleados y otro para visitantes, con salidas y entradas indepen-dientes. También se solicitaron estacionamientos para los jueces y las juezas, y otros espacios de estacionamientos para los vehículos oficiales. El terreno debía contar con cabida adicional para una futura ampliación del edificio principal.
En cuanto al diseño y a la estructura del centro judicial, se requirió un área neta utilizable de 110,000 pies cuadrados. Otro requisito era que la estructura debía cons-truirse en hormigón reforzado o combinado, con acero estructural. Además, se requirió que se incluyera la infra-estructura necesaria para que se considerara como un “edi-ficio inteligente”, entre otras especificaciones relacionadas con la entrada privada para los jueces, confinados, seguri-dad, ascensores, sistemas de acondicionadores de aire, alumbrado y otros requisitos para los espacios interiores del edificio y del estacionamiento.
Los licitadores STZ, Maranello, Bird y Roig fueron cua-tro de los nueve proponentes que participaron en el proceso de subasta informal. Los otros proponentes fueron: Judicial Center Development Group (Judicial Center), Aibonito Building & Development, Corp. (Aibonito Building), ASOMA Development, Inc. (ASOMA), BluPoint Development & Construction Management, Inc. (BluPoint) y NORAVI Developers, Inc. (NORAVT).
La Directora Administrativa de los Tribunales, la jueza Sonia I. Vélez Colón, nombró a un Comité Evaluador para que analizara las propuestas sometidas y emitiera sus recomendaciones. El Administrador de la División de Locales y Servicios Especiales de la O.A.T., Ing. José F. Moreno Navarro, presidió el Comité Evaluador que estaba com- *783 puesto por varios directores de la O.A.T. y otros funciona-rios de la Rama Judicial. Además, la O.A.T. contrató al Ing. Angel Herrera Blanco como consultor externo.
El ingeniero Herrera sometió un extenso y detallado in-forme en el cual evaluó los aspectos técnicos y especifica-ciones de cada una de las propuestas. En el informe se detallaron los diez criterios utilizados por el Comité Eva-luador para evaluar cada una de las propuestas conforme a las especificaciones del RFR Estos fueron:
1. Ubicación o localización del terreno.
2. Amplitud o tamaño del terreno.
3. Calidad y funcionalidad del terreno.
4. Certificación del edificio como Green Building.
5. Uso de materiales de primera calidad.
6. Calidad y funcionalidad en el estacionamiento para funcionarios y público.
7. Tiempo de construcción.
8. Monto del canon de arrendamiento.
9. Historial del cumplimiento del desarrollador en otros proyectos similares realizados.
10. Estructura Administrativa y Recursos del Pro-grama de Mantenimiento.
El Comité Evaluador asignó una escala de valoración del 1 al 10 en cada criterio. La metodología del estudio consistió en el análisis técnico de cada una de las propues-tas y su comparación con el cumplimiento de las especifi-caciones del RFP. Incluyó, además, un resumen de cada propuesta, un análisis comparativo de los diez criterios evaluados y los resultados de la evaluación. También se coordinaron varias visitas a los terrenos propuestos y se consultaron los mapas de zonificación del municipio de Ai-bonito, entre otros documentos. En el informe se incluyó una fotografía aérea que ilustró la ubicación de los terre-nos propuestos. Además, se incorporó una tabla con el re-sumen de las evaluaciones y el total de los puntos que cada proponente obtuvo en los diez criterios que se analizaron.
*784 La O.A.T. adoptó los resultados del Informe de Evalua-ción Técnica y notificó el orden de preferencia siguiente:
(1) STZ (82 puntos)
(2) Bird (76 puntos)
(3) Maranello (75 puntos)
(4) Roig (73 puntos)
(5) Aibonito Building (67 puntos)
(6) BluPoint (63 puntos)
(7) Judicial Center (61 puntos)
(8) ASOMA (54 puntos)
(9) NORAVI (53 puntos)
Inconforme con la puntuación obtenida, Maranello (ter-cero en la lista de preferencia), Bird (segundo) y Roig (cuarto) solicitaron la reconsideración del orden de preferencia. No obstante, Roig fue el único proponente que no prestó la fianza que se requería para solicitar la recon-sideración del dictamen conforme al “Reglamento de Su-bastas Formales de Bienes y Servicios de la Rama Judicial”, vigente desde el 1 de julio de 2003.
Las tres solicitudes de reconsideración se refirieron a la Oficina de Asuntos Legales de la O.A.T. para su evaluación. El Comité Evaluador emitió dos informes en el proceso de reconsideración. Ambos informes analizaron los argumentos de los tres proponentes en tomo a las puntua-ciones que se les asignaron en cada uno de los criterios impugnados. Los tres proponentes cuestionaron las alega-das deficiencias de la propuesta de STZ.
En síntesis, se cuestionó la puntuación que obtuvo STZ en los criterios de localización del terreno, amplitud o ta-maño del terreno, espacio adicional para expansión del edi-ficio y ciertos aspectos relacionados con la calidad y funcio-nalidad del diseño. También se cuestionó el resultado de la evaluación de las propuestas en el criterio de Green Building, el espacio de estacionamiento, el monto del canon de arrendamiento y las puntuaciones que se asignaron en el criterio del historial de cumplimiento de los desarrollado-res en proyectos similares.
*785 La Oficina de Asuntos Legales de la O.A.T. acogió las recomendaciones del Comité Evaluador y emitió un informe. Concluyó que la evaluación del Comité Evaluador fue razonable y se fundamentó en los documentos que for-man parte del expediente administrativo. Según el in-forme, ninguna de las nueve propuestas que se recibieron cumplió estrictamente con todos los requisitos establecidos en el RFP, pero la mayoría de ellas cumplió con los requi-sitos fundamentales. Determinó que el Comité Evaluador utilizó su discreción y evaluó las propuestas a base de un análisis comparativo con los diez criterios del RFP. Las puntuaciones reflejaron el nivel de cumplimiento de cada propuesta con los criterios establecidos.
Empero, la Oficina de Asuntos Legales reconsideró las puntuaciones que se asignaron en los criterios siguientes: (1)certificación del edificio como Green Building, (2) histo-rial de cumplimiento. Como resultado de la reconsidera-ción, Bird bajó del segundo al cuarto lugar en la lista de preferencias, mientras que Roig ascendió del cuarto al se-gundo lugar.
La O.A.T. acogió las recomendaciones de la Oficina de Asuntos Legales y, el 23 de diciembre de 2010, notificó un nuevo orden de preferencia en la negociación del proyecto. El orden fue el siguiente:
(1) STZ (82 puntos)
(2) Roig (77 puntos)
(3) Maranello (76 puntos)
(4) Bird (75 puntos)
(5) Aibonito Building (67 puntos)
(6) BluPoint (63 puntos)
(7) Judicial Center (61 puntos)
(8) ASOMA (54 puntos)
(9) NORAVI (53 puntos)
Inconformes, Maranello y Bird presentaron recursos de revisión ante el Tribunal de Apelaciones en los cuales soli-citaron que se revisara el orden de preferencia adjudicado *786 por la O.A.T. Ambos licitadores alegaron que le corres-ponde el primer lugar para la negociación del proyecto.
Maranello señaló que el Comité Evaluador actuó arbi-trariamente al asignar los porcentajes en los criterios que se evaluaron. Según sus argumentos, solo se asignó un 10% en la evaluación del criterio del precio del canon de arrendamiento, lo que ocasionó que la O.A.T. escogiera una propuesta más costosa que la suya.
En segundo lugar, Maranello planteó que la O.A.T. tenía que descalificar a los proponentes que no cumplieron con los requisitos básicos del RFP. Indicó que seis de los nueve proponentes, incluyendo a STZ y Roig, no proveyeron un espacio para la expansión o el crecimiento futuro del Cen-tro Judicial nuevo de Aibonito. Por otro lado, señaló que procede la descalificación de STZ, ya que entiende que en su propuesta se omitió información indispensable. Por úl-timo, Maranello señaló varios errores relacionados con las puntuaciones que la O.A.T. asignó en siete de los diez cri-terios que se evaluaron.
Bird, por su parte, impugnó que se le colocara en el cuarto lugar en el orden de preferencia. Primero, alegó que Roig no prestó la fianza en reconsideración requerida por el Reglamento de Subastas, por lo que la O.A.T. erró al acoger su moción de reconsideración. También planteó que su propuesta fue la que mejor cumplió con los requisitos del RFP y cuestionó las puntuaciones que se asignaron en seis de los diez criterios que se evaluaron.
Roig, por su parte presentó un alegato en oposición en el cual cuestionó las puntuaciones que se asignaron en varios de los criterios del RFP. Bird solicitó la desestimación del alegato de Roig, por entender que era realmente un re-curso de revisión que fue presentado tardíamente.(1)
Luego de analizar el voluminoso expediente, el Tribunal *787 de Apelaciones dictó sentencia y resolvió, en primer lugar, no considerar los argumentos de Roig. Determinó que esa parte no podía traer en oposición lo que no había presen-tado en un recurso de revisión. Por lo tanto, el foro apela-tivo se limitó a considerar los argumentos en oposición que se relacionaban con los errores señalados en los recursos de Maranello y Bird.
Por otra parte, el Tribunal de Apelaciones determinó que la O.A.T. había errado al cambiarle las puntuaciones a Roig, porque esta no cumplió con las disposiciones regla-mentarias que requerían depositar una fianza. Por lo tanto, modificó el orden de preferencia de acuerdo con la puntuación que le corresponde a Roig. De esta forma, el orden de preferencia para la negociación del proyecto de construcción del Centro Judicial de Aibonito es el si-guiente:
1. STZ (82 puntos)
2. Maranello (76 puntos)
3. Bird (75 puntos)
4. Roig (73 puntos)
5. Aibonito Buildind (67 puntos)
6. BluPoint (63 puntos)
7. Judicial Center (61 puntos)
8. ASOMA (54 puntos)
9. NORAVI (53 puntos)
Tanto Bird como Maranello presentaron mociones de re-consideración, las cuales fueron denegadas mediante reso-luciones emitidas el 28 septiembre de 2011 y notificadas el 5 de octubre de 2011.
Inconforme con lo resuelto, Bird presentó el recurso CC-2011-0892 y plantea los errores siguientes:
Primer Error: Erró el Tribunal de Apelaciones al confirmar la determinación de la OAT, quien actuó de manera irrazonable, arbitraria y caprichosa al colocar a Bird-Interplan en el tercer lugar en el Orden de Preferencia de la Negociación aún [sic] cuando cumplió con los requisitos y criterios de evaluación.
Segundo Error: Erró el Tribunal de Apelaciones al confirmar *788 la determinación de la OAT de adjudicar a STZ Development, Corp. el primer [lugar en el] Orden de Preferencia en la Nego-ciación concediendo una puntuación mayor o similar a la de Bird-Interplan en renglones en que STZ no fue responsivo o era inferior a la propuesta de Bird-Interplan. (Enfasis suplido). Certiorari, Núm. CC-2011-0892, págs. 5-6.
Por su parte, Maranello esboza en el recurso CC-2011-0895 los señalamientos de error siguientes:

Erró el [Tribunal de Apelaciones] al confirmar que actuó co-rrectamente el Comité Evaluador al asignar porcentuales y lo pesos a los distintos criterios de evaluación.

Erró el [Tribunal de Apelaciones] al confirmar que actuó co-rrectamente la OAT al no haber descalificado a aquellos pos-tores que no cumplieron con uno de los “requisitos básicos de más importancia”, el de “proveer espacio para expansión o cre-cimiento futuro en área utilizable y facilidades”.

Erró el (Tribunal de Apelaciones] al concluir que la OAT tenía discreción para aceptar una propuesta que incluía un diseño estructural prohibido en el RFP y que incumple con la regla-mentación de seguridad; razón por la que debía haber sido descalificada.

Erró el [Tribunal de Apelaciones] al haber concluido que actuó correctamente la OAT al no haber descalificado la propuesta de STZ en tanto no fue responsiva.

El Comité evaluador actuó en forma arbitraria y caprichosa al adjudicar la puntuación que dio lugar a adjudicación de la subasta. Certiorari, CC-2011-0895, págs. 3-4.
La O.A.T. presentó un “Memorando Consolidado en Oposición a Expedición de Autos” (Memorando de la O.A.T.) en el que sostiene que este Tribunal debe declarar no “ha lugar” las peticiones de certiorari de Bird y Maranello. Por su parte, STZ presentó memorandos en oposición a que se expida el certiorari en ambos recursos. Atendidos los petitorios, ordenamos la consolidación de los casos CC-2011-0892 y CC-2011-0895 y acordamos expedir.
Contando con el beneficio de sus comparecencias, proce-demos a resolver.
*789 II
A. El mecanismo del Request for Proposal (RFP)
Es harto sabido, que los procedimientos de las subastas gubernamentales están revestidos del más alto interés pú-blico y aspiran a promover la sana administración gubernamental. Caribbean Communications v. Pol. de P.R., 176 D.P.R. 978, 994 (2009); Costa Azul v. Comisión, 170 D.P.R. 847, 854 (2007). El procedimiento de subasta para lograr la adquisición de bienes y servicios evita el favoritismo, la corrupción, la extravagancia y el descuido al otorgarse contratos. Aut. Carreteras v. CD Builders, Inc., 177 D.P.R. 398, 404 (2009); Accumail P.R. v. Junta Sub. A.A.A., 170 D.P.R. 821, 827 (2007); Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990).
Aunque el gobierno debe procurar que las obras públi-cas se realicen al precio más bajo posible, existen otros criterios, además del precio, que tienen que ser evaluados por la Junta de Subastas al momento de adjudicarla. C. Const. Corp. v. Mun. de Bayamón, 115 D.P.R. 559, 562—563 (1984). Algunos de estos factores incluyen que las propues-tas sean conformes con las especificaciones de la agencia, la habilidad del postor para realizar y cumplir con el con-trato, la responsabilidad económica del licitador, y su repu-tación e integridad comercial, entre otros factores. Id., pág. 563.
Las consideraciones de orden público como los servicios o productos técnicos, la probabilidad de realizar la obra de manera más eficiente y en el tiempo acordado, y los mate-riales que ofrezca un postor de la propuesta que no es la más económica, pueden llevar a la agencia a seleccionarlo, si ello corresponde a sus mejores intereses. Caribbean Communications v. Pol. de P.R., supra, pág. 1007; Empresas Toledo v. Junta de Subastas, 168 D.P.R. 771, 779 (2006).
*790 Aunque la subasta formal es el método tradicional para regular la adquisición de bienes y servicios, se ha validado, como alternativa, la compra negociada y el mecanismo de requerimiento de propuestas o RFP cuando se trata de bie-nes o servicios especializados que involucran aspectos alta-mente técnicos y complejos, o cuando existen escasos com-petidores cualificados. Caribbean Communications v. Pol. de P.R., supra, pág. 996; R & B Power v. E.L.A., 170 D.P.R. 606, 621-622 (2007).
El mecanismo de propuestas se destaca por su mayor informalidad y flexibilidad, así como por el grado de discre-ción que se el confiere a la entidad pública en la conside-ración de la propuesta recibida, en comparación con la su-basta tradicional. R & B Power v. E.L.A., supra, pág. 623. Además, a diferencia del procedimiento formal de subasta, el RFP permite la compra negociada y confiere a los licita-dores la oportunidad de revisar y modificar sus ofertas antes de la adjudicación de la buena pro. Id., pág. 621.
Por otro lado, contrario al proceso de una subasta formal en el que se someten las propuestas selladas, el RFP admite preguntas y sugerencias por parte de los licitadores para delinear una propuesta que se ajuste a las necesida-des particulares de la agencia. Se trata de un proceso de negociación entre la agencia y los licitadores que cuentan con un mayor grado de conocimiento especializado en el servicio requerido.
Aunque el procedimiento de subasta formal y el reque-rimiento de propuestas son distintos, no son totalmente incompatibles. El RFP, por ser un mecanismo alterno al procedimiento tradicional, necesariamente participa de al-guna de las características de la subasta formal. Específi-camente, al igual que la subasta formal el requerimiento de propuestas está sujeto a los requisitos de notificación, así como los procedimientos de reconsideración y revisión judicial contenidos en la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), Ley Núm. 170 de 12 de agosto de *791 1988 (3 L.P.R.A. sec. 2101 et seq.). Caribbean Communications v. Pol. de P.R., supra, pág. 998.
B. La revisión judicial de las determinaciones de la O.A.T.
Al amparo de la Ley Núm. 345-2000 (4 L.P.R.A. sec. 24 et seq.), la Asamblea Legislativa facultó al Juez Presidente del Tribunal Supremo o a la Directora Administrativa de los Tribunales, por delegación de este, para adquirir bienes y servicios “de la forma que considere más efectiva, efi-ciente y necesaria en beneficio de la Rama Judicial”. Art. 1(a) de la Ley Núm. 345 (4 L.P.R.A. sec. 24(j)).(2)
De acuerdo con la autoridad conferida, se aprobó el Re-glamento de Subastas Formales de Bienes y Servicios de la Rama Judicial, 1 de julio de 2003, mediante el cual se es-tableció un procedimiento uniforme para llevar a cabo la adquisición de bienes y servicios en la Rama Judicial, la evaluación de las propuestas de los licitadores, la adjudi-cación de subastas y el ingreso de suplidores en el Registro, entre otros aspectos pertinentes al proceso, http:// www.ramajudicial.pr/leyes/subastas/index.htm
En relación con el proceso de la compra negociada y la adquisición de bienes o servicios especializados y comple-jos, el Art. XXTV(5) del Reglamento de Subastas dispone, en lo pertinente:
(5) Proceso de negociación
El Comité Evaluador remitirá al Director Administrativo sus recomendaciones y el orden de negociación establecido. El Director Administrativo nombrará un Comité de Negociación, designando a uno de ellos como presidente, o delegará en la junta de subastas el efectuar la negociación correspondiente.
La negociación se iniciará con el licitador designado en el primer lugar. Si no se llega a un acuerdo favorable se continuará la negociación con el suplidor designado en segundo lugar y así sucesivamente. Cuando se llegue a un acuerdo favorable para la Rama Judicial, se emitirá una notificación de *792 adjudicación. Si la negociación la llevó a cabo el Comité de Negociación, el Presidente del Comité de Negociación emitirá la notificación de adjudicación. Si la negociación la efectuó la Junta de Subastas, el Secretario de la Junta emitirá la notifi-cación de adjudicación. En ambos casos la adjudicación se no-tificará a todos los suplidores que participaron y al Jefe de Compras.
El Comité de Negociación preparará un informe de cada nego-ciación efectuada con cada uno de los suplidores seleccionados. Dichos informes formarán parte del expediente de la compra negociada.
Si no se llegara a un acuerdo con los suplidores seleccionados, se procederá con la compra en mercado abierto.(3)
Se ha establecido que el procedimiento para la revisión judicial de las determinaciones administrativas de la Rama Judicial es “ ‘similar al que es utilizado cuando el tribunal, actuando como foro apelativo, revisa la corrección o incorrección de la sentencia emitida por un tribunal inferior o la decisión de un organismo administrativo’ Rivera v. Dir. Adm. Trib., 144 D.P.R. 808, 821-822 (1988), citando a U.I.L. de Ponce v. Adm. Trib., 116 D.P.R. 348, 355 (1985).
Al igual que otras decisiones administrativas, las deter-minaciones de la O.A.T. gozan de una presunción de lega-lidad y corrección. Com. Seg. v. Real Legacy Assurance, 179 D.P.R. 692, 716-717 (2010). En el contexto de las subastas gubernamentales la norma general es que la Junta de Su-bastas de la agencia goza de amplia discreción en la eva-luación de las propuestas sometidas ante su consideración. Caribbean Communications v. Pol. de P.R., supra, pág. 1006; Accumail P.R. v. Junta Sub. A.A.A., 170 D.P.R. 821, 828-829 (2007).
De ordinario, la agencia u organismo público es quien posee una vasta experiencia y especialización que la colo-can en mejor posición que el foro judicial para seleccionar el postor que más convenga al interés público. Id.; Empre *793 sas Toledo v. Junta de Subastas, supra, pág. 783; Fac. C. Soc. Aplicadas, Inc. v. C.E.S., 133 D.P.R. 521, 533 (1993).
Una vez se adjudique la buena pro, los tribunales no deben sustituir el criterio de la agencia o junta concernida, a menos que se demuestre que la decisión se tomó de forma arbitraria o caprichosa, o que medió fraude o mala fe. Caribbean Communications v. Pol. de P.R, supra, pág. 1006; Torres Prods. v. Mun. Aguadilla, 169 D.P.R. 886, 898 (2007). En ausencia de estos elementos, “ningún postor tiene derecho a quejarse cuando otra proposición es elegida como la más ventajosa. La cuestión debe decidirse a la luz del interés público”. Great American Indemnity Co. v. Gobierno de la Capital, 59 D.P.R. 911, 916 (1942). En estos casos, la determinación de la agencia será sostenida si cumple con el criterio de razonabilidad. Accumail P.R. v. Junta Sub. A.A.A., supra, pág. 829.(4)
Por otro lado, la revisión de subastas es limitada y se rige por principios similares a los que gobiernan la revisión de los procedimientos celebrados ante las agencias, aunque no les aplique la Ley de Procedimiento Administrativo Uniforme. Caribbean Communications v. Pol. de P.R., supra, pág. 1006. Es decir, la facultad revisora de los foros apelativos se limita a determinar si la agencia actuó arbi-traria, ilegalmente o de manera tan irrazonable que su ac-tuación constituyó un abuso de discreción. Cruz v. Administración, 164 D.P.R. 341, 355 (2005).
Analizado el marco jurídico aplicable al caso de autos, procedemos a resolver.
III
Para facilitar la discusión de los errores que se incluye-ron en los recursos consolidados, atendemos de forma con- *794 junta los errores relacionados con la evaluación de los cri-terios del RFP señalados por Bird y Maranello. Como parte de su determinación, el Tribunal de Apelaciones incluyó en su sentencia las puntuaciones que se asignaron a los pro-ponentes que ocuparon la primera, segunda, tercera y cuarta posición en el orden de preferencia según los diez criterios del RFP. La puntuación es la siguiente:
[[Image here]]
Sentencia del Tribunal de Apelaciones, CC-11-892, pág. 20.
Por entender que la sentencia del Tribunal de Apelacio-nes plasma de forma íntegra la evaluación de las propues-tas de acuerdo a cada uno de los criterios del RFP, proce-demos a citarla in extenso:
1. Ubicación o localización del terreno
Maranello y Bird alegaron que se les debe asignar la mayor puntuación en este criterio porque ambos entienden que la ubicación de sus terrenos es superior a la ubicación que pro-puso STZ.
Por un lado, Maranello señaló que el nuevo centro judicial no debe construirse en el casco urbano de Aibonito, sino que debe ubicarse en un sitio céntrico y accesible a los otros cinco *795 municipios que componen la Región Judicial de Aibonito. Es por ello que Maranello propuso un terreno localizado al oeste del casco urbano del mencionado municipio.
Por otro lado, Bird alegó que la ubicación del terreno pro-puesto por STZ aumentaría el problema del tráfico en el casco urbano de Aibonito. Según sus argumentos, STZ no sometió un estudio de tráfico relacionado con el impacto y los proble-mas de tránsito que pudiera ocasionar la ubicación del nuevo Centro Judicial en el casco urbano de Aibonito. Señaló, ade-más, que el proyecto de STZ no contaba con el endoso del alcalde de Aibonito.
El expediente refleja que los argumentos de Maranello y Bird fueron evaluados en los dos informes que emitió el Co-mité Evaluador en reconsideración y en el informe final de la Oficina de Asuntos Legales. De igual forma, el Informe de Evaluación Técnica y los tres informes en reconsideración re-velan que la ubicación del terreno de Maranello recibió una de las puntuaciones más bajas por su ubicación. Como cuestión de hecho, Noravi recibió 1 punto, seguido por Maranello, quien recibió 2 puntos.[15]
En los tres informes en reconsideración se detallaron las razones por las cuales el terreno de Maranello recibió una de las puntuaciones más bajas. Primero, la localización de su te-rreno fue la más lejana al casco urbano de Aibonito, en com-paración con las otras propuestas.[16] Segundo, el terreno se ubica en la carretera núm. PR-162, que según las determina-ciones del Comité Evaluador, es una carretera sumamente estrecha. Tercero, el terreno está fuera del área zonificada de Aibonito, lo que requeriría presentar una consulta de ubica-ción para aprobar la construcción del proyecto. Cuarto, en los alrededores del terreno de Maranello no existen instalaciones de apoyo a los usuarios del tribunal, tales como bancos o esta-blecimientos de comidas.[17] El Comité Evaluador concluyó que, aun cuando el nuevo Centro Judicial de Aibonito incluyera espacios tales como, cafeterías, espacios de estacionamiento y gimnasios, ello no significaba que el proyecto se ubicara en un espacio aislado y desconectado del resto del vecindario.[18]
*796 El expediente refleja que el terreno propuesto por Maranello tenía serias deficiencias en cuanto a su ubicación, vías de ac-cesos y cercanía con las instalaciones comerciales. Tales defi-ciencias fueron plasmadas detalladamente en el Informe de Evaluación Técnica y en los tres informes en reconsideración.
El Comité Evaluador tomó en consideración el aspecto de que el terreno estuviera cerca de instalaciones comerciales y fue un elemento importante al evaluar este criterio. También eva-luó las vías de acceso en cada uno de los terrenos propuestos. La Oficina de Asuntos Legales acogió las recomendaciones del Comité Evaluador y concluyó que “los predios que estaban cerca del centro urbano, justo a las afueras del centro del pueblo, pero fuera del área donde existe la congestión vehicular típica de dichos centros, fueron evaluados favorablemente.[19]
Un examen del expediente refleja que la ubicación de los terrenos de Bird y STZ recibieron las puntuaciones más altas. Según las conclusiones del Comité Evaluador y la Oficina de Asuntos Legales, ambos terrenos se encontraban cercanos o adyacentes al centro urbano de Aibonito, pero justo a las afue-ras del casco urbano. El Comité Evaluador determinó que la localización de los terrenos de Bird y STZ no debía contribuir significativamente a la congestión de tránsito, toda vez que no estaban localizados en un área donde existía este problema. Además, señaló que el terreno de STZ no se encontraba dentro del casco urbano de Aibonito, sino en la periferia, a unos 1200 metros de la plaza de recreo.[20]
A diferencia del terreno de Maranello, el resto de los terre-nos se ubicaron en la carretera número PR-14, que es una vía principal que da acceso al municipio de Aibonito y provee un acceso adecuado al resto de los municipios colindantes.
Valga señalar que la diferencia entre las puntuaciones de STZ y Bird fue de un solo punto. El Comité Evaluador con-cluyó que STZ, quien obtuvo 9 puntos, fue quien mejor cum-plió con el criterio de la ubicación. No obstante, Bird cuestionó esta puntuación bajo dos premisas. Primero, alegó que STZ no tenía el endoso del Municipio de Aibonito para la ubicación del terreno y segundo, que la ubicación de STZ aumentaba el pro-blema de tráfico en el casco urbano.
Los argumentos de Bird fueron evaluados en los tres infor-mes que se emitieron en reconsideración. En relación con su *797 primer argumento, el Comité Evaluador concluyó que el en-doso del Municipio de Aibonito no era un requisito para cum-plir con las especificaciones preliminares del RFP, ni fue un aspecto que se consideró al momento de evaluar las propuestas. No empece a ello, en el informe del 20 de diciem-bre de 2010, la Oficina de Asuntos Legales aclaró lo siguiente:
“Más adelante, como parte del proceso de planificación y diseño, la entidad de desarrollo seleccionada tendrá que obte-ner todos los permisos y aprobaciones necesarias para el desa-rrollo del proyecto, incluyendo los endosos y aprobaciones del Municipio de Aibonito que sean requeridas por ley o reglamentos. Por otro lado, de la información sometida en cada una de las propuestas que forman parte del expediente administrativo, no surge oposición, de parte del Municipio de Aibonito, a alguna de las propuestas recibidas.[21]”
Tampoco el RFP requería que los proponentes realizaran un estudio de los problemas de tráfico que pudieran ocasionar la ubicación de sus terrenos. Por lo tanto, aun cuando STZ no sometiera un estudio de tráfico o el endoso del Municipio de Aibonito, el Comité Evaluador concluyó que estos documentos no eran necesarios al momento de evaluar su propuesta y de-signar el orden de preferencia. De hecho, el Comité Evaluador concluyó que la ubicación del terreno propuesto por STZ no debía tener un impacto significativo en el tráfico.
Ahora bien, Bird señala que su propuesta fue la única que contó con una consulta de ubicación debidamente aprobada por la Junta de Planificación. Ante ello, alega que la O.A.T. debió seleccionarlo como el licitador agraciado. Sostiene que la construcción de la nueva sede judicial no sería viable sin la consulta de ubicación y el endoso del Municipio de Aibonito. Para sustentar sus argumentos citó, como ejemplo, el caso de STZ Development, Corp. v. Junta de Planificación, KL-RA200900021 del 12 de mayo de 2009.[22] En este caso, la Junta de Planificación denegó la consulta de ubicación presentada por STZ para la construcción del nuevo Centro Judicial de Caguas, y su dictamen fue confirmado por el Tribunal de Apelaciones. A base de este ejemplo, Bird señala que la pro-puesta de STZ para el Centro Judicial de Aibonito, no contó con una consulta de ubicación aprobada. Sostiene que la omi-sión de STZ contraviene los mejores intereses de la O.A.T. y la celeridad de los procesos, si se toma en consideración las pa- *798 sadas experiencias con este licitador. Los planteamientos de Bird no son correctos.
Contrario a los argumentos de Bird, lejos de favorecer a STZ, en pasadas ocasiones la O.A.T. ha seguido el proceso de negociación según el orden de preferencia designado por el incumplimiento del licitador agraciado. Por ejemplo, en el caso del Centro Judicial de Caguas, la Junta de Planificación no aprobó la consulta de ubicación presentada por STZ. Ante ello, la O.A.T. continuó el proceso de negociación con el segundo proponente designado en el orden de preferencia (Ramhill Developers, Inc.). De esta forma, la O.A.T. continuó el proceso de negociación con el segundo proponente en la lista de preferencia.
Valga señalar que los recursos de mandamus presentados por STZ, los cuales se relacionaron con diversos trámites ad-ministrativos que se suscitaron luego de la sentencia del 2009 en el caso del Centro Judicial de Caguas, fueron denegados por el Tribunal de Apelaciones. Véase, por ejemplo: STZ Development Corp. v. Junta de Planificación, KLRX201100015 del 13 de mayo 2011, relacionado con la consulta de ubicación de Ramhill Developers.[23] Véase, además, STZ Development Corp. v. Municipio Autónomo de Caguas, KLRX201000058 del 14 de octubre de 2010, relacionado con el Plan de Area del Municipio de Caguas para la construcción del nuevo Centro Judicial de Caguas.[24]
Lo anterior denota que en las pasadas negociaciones de pro-yectos similares al Centro Judicial de Aibonito, la O.A.T. no ha brindado un trato preferencial a STZ, sino por el contrario, le ha exigido cumplir con los requisitos de la negociación. Los casos citados evidencian que STZ ha tenido que cumplir con todos los requisitos establecidos para viabilizar el contrato con la O.A.T., pues de lo contrario, el proceso de negociación con-tinuará con el próximo licitador en el orden de preferencia.
En el caso ante nuestra consideración, el RFP del proyecto de Aibonito no requería que los proponentes sometieran una consulta de ubicación durante el proceso preliminar de la eva-luación de las propuestas. Tampoco la O.A.T. estaba obligada a exigir una consulta de ubicación aprobada, como requisito pre-vio para evaluar las propuestas. Se trata de una etapa preli-minar donde se evalúan las propuestas para luego designar el orden de preferencia. La aprobación de la consulta de ubica-ción es un trámite que se inicia, luego de que se notifique el *799 orden de preferencia para la negociación de la nueva sede judicial de Aibonito.
Las determinaciones de la O.A.T. al evaluar y asignar las puntuaciones por la ubicación de los terrenos son razonables y están avaladas por los documentos que obran en el expediente administrativo.
Por lo tanto, el análisis que el Comité Evaluador utilizó, en el ejercicio de su expertise, para evaluar la ubicación de los terrenos, no debe ser sustituido por el nuestro. Procede confir-mar las puntuaciones que se asignaron en el criterio de ubicación.
2. Amplitud del terreno
a. Cabida adicional para ampliación futura del edificio.
En el RFP se especificó que “el terreno de las nuevas insta-laciones del Centro Judicial debe contar con cavidad [sic] adi-cional para ampliación futura”.[25] Conforme los argumentos de Maranello y Bird, la propuesta de STZ no incluyó un espacio que permitiera ampliaciones futuras. Maranello específica-mente señala que esta omisión es insubsanable, por lo que la O.A.T. tenía que descalificar a los licitadores que no cumplie-ron con tal requisito, incluyendo a STZ.
Por otro lado, tanto Bird como Maranello señalan que el terreno de STZ tiene una cabida menor y alegan que la O.A.T. actuó arbitrariamente al otorgarle 8 puntos. Bird propuso un terreno de 8 cuerdas y obtuvo una puntuación de 10 puntos. Sin embargo, alega que se concedieron 8 puntos a STZ por un terreno de solo 4 cuerdas. Ante ello, sostiene que la O.A.T. actuó arbitrariamente al asignar las puntuaciones por la am-plitud del terreno.
En su alegato en oposición, la O.A.T. argumentó que la am-plitud del terreno fue un criterio importante, pero no fue un requisito determinante al momento de evaluar las propuestas. Según sus planteamientos, los participantes que ofrecieron los terrenos de mayor cabida o tamaño recibieron puntuaciones más altas. No obstante, el terreno de STZ de 4.01 cuerdas, obtuvo una puntuación similar a los terrenos de mayor cabida por las siguientes razones: (1) algunas de las propuestas de mayor cabida tenían una topografía que no permitía usar parte del terreno, y (2) el terreno de STZ podía utilizarse en su totalidad.
El expediente refleja que los terrenos de mayor dimensión obtuvieron puntuaciones más altas en este criterio. Por ejem-plo, Bird, con su terreno de 18.6544 cuerdas obtuvo 10 puntos. *800 Roig, por su terreno de 8.354 cuerdas obtuvo 9 puntos. Mara-nello propuso un terreno de 9.04, más 5.27 cuerdas de expan-sión futura, por lo que obtuvo 10. STZ, con un terreno de 4.01 cuerdas, obtuvo 8 puntos.[26] Lo anterior denota que las pun-tuaciones corresponden al tamaño mayor de los terrenos y a la cabida real que podía utilizarse para la construcción del proyecto.
Ahora bien, Bird argumentó que la propuesta de STZ carece de especificidad, toda vez que solo ofreció un piso adicional en el edificio, de ser necesario. Sin embargo, STZ no detalló las escaleras ni los elevadores que se utilizarían.
Los argumentos de Bird fueron atendidos en los tres infor-mes en reconsideración. El Comité Evaluador concluyó que la propuesta de STZ permitía construir un piso adicional en los edificios.[27] Aparte de construir un piso adicional, en la pro-puesta de STZ aparecían varias áreas sin construcción, que también podían utilizarse para una ampliación futura del edificio. En el diseño se propuso la construcción de 3 edificios (administración, salas y otros espacios de estacionamiento) los cuales estarán interconectados mediante una construcción eficiente.[28] El Comité Evaluador, además, concluyó que el he-cho de que no se proveyeran detalles sobre las especificaciones de las escaleras o elevadores, no impedía que se evaluara la propuesta de STZ en esta etapa de los procedimientos, porque la información requerida era preliminar. En fin, la dimensión del área o amplitud del terreno propuesta por STZ cumple con el criterio. Sin embargo, la mayor extensión del terreno de los otros proponentes les significó una mejor puntuación en ese criterio que la recibida por STZ. Dicho de otra forma, la pro-puesta de STZ cumple con lo requerido, pero lo ofrecido por Bird es superior. En el supuesto de que se le redujera un punto a STZ en el criterio de la amplitud del terreno, ello no afecta el resultado final en el orden de preferencia.
Analizado lo anterior, concluimos que la escala valorativa y los aspectos que tomó en consideración la O.A.T. para exami-nar la amplitud de los terrenos fueron razonables y sus deter-minaciones están sostenidas por la evidencia sustancial que obra en el expediente.
3. Calidad y funcionalidad del diseño y construcción
a. Uso hormigón postensado
En el RFP se especificó que la construcción de las facilida- *801 des sería en hormigón armado u hormigón armado en acero. Las propuestas debían incluir lo siguiente:
“4. Cimientos y estructuras
Deben ser en hormigón armado u hormigón armado y acero. El proponente establecerá las razones para la utilización de un sistema estructural u otros. Las naves estructurales no deben ser menos de 30' x 30' y se requerirá un sistema modular repetitivo dentro de las áreas principales. El proponente será responsable de que la estructura cumpla con los requisi-tos de los códigos y reglamentaciones aplicables con relación a resistencia, seguridad e integridad estructural y se debe ga-rantizar un diseño de vida útil de nos menos de cincuenta (50) años.”[29]
Maranello adujo que STZ incluyó hormigón postensado en el diseño de la estructura del edificio de estacionamientos, por lo que incumplió con las especificaciones del RFP.
La O.A.T., por su parte, adujo que en esta etapa de los pro-cedimientos, se permitía una desviación de las especificacio-nes del RFP si se explicaba detalladamente en la propuesta. Sobre este particular, la instrucción núm. 1 del RFP indicó lo siguiente:
“1. Preparación de Propuesta
a. Los proponentes someterán toda la información reque-rida en las instrucciones, especificaciones y criterios estableci-dos en la Solicitud de Propuesta (RFP). Deben someter toda la información que se solicite y consideren necesaria, incluyendo planos, especificaciones y fotografías o recortes de catálogos, equipos, materiales y métodos de construcción. Cualquier des-viación de los requisitos establecidos tiene que ser explicada claramente por el proponente o desarrollador.
e. Cualquier propuesta condicionada o con limitaciones podría ser descalificada. Cualquier limitación o condición de-berá ser aclarada en detalle. (Citas omitidas y énfasis suplido.)”[30]
La O.A.T. señala que ninguna de las propuestas cumplió con todos los requisitos y especificaciones establecidas en el RFP.[31]
Sostiene, además, que en la etapa preliminar en la que se encuentra la evaluación de las propuestas se podía incluso considerar que se construyera el edificio de estacionamiento en hormigón postensado, si se proveen las razones válidas para la desviación. Señala que el ingeniero estructural de STZ *802 recomendó el hormigón postensado, ya que entendía que era el material más conveniente para la eliminación de grietas en las losas, menos peralto entre los pisos, mayor rapidez en la construcción del edificio y menos deflexión y vibración en la estructura.
No empece a lo anterior, la O.A.T. entiende que STZ cumplió con las especificaciones del RFP, ya que en su propuesta in-cluyó la alternativa de construir el edificio del estaciona-miento en acero y hormigón, al mismo precio que la oferta de hormigón postensado. Ahora bien, señaló que el detalle de la alternativa en acero y hormigón no se incluyó en la propuesta de STZ debido a la limitación en la cantidad de las páginas que se permitieron someter (el RFP estableció hasta un máximo de 20 páginas).[32]
No vemos fundamento para variar las puntuaciones que se asignaron en este criterio. STZ explicó las razones para la desviación de las especificaciones del RFP, las cuales fueron válidamente aceptadas por el Comité Evaluador.[33] Además, STZ proveyó una alternativa de construcción en acero y hor-migón por el mismo precio que el material de hormigón pos-tensado, lo que fue suficiente para cumplir con las especifica-ciones del RFP en esta etapa de los procedimientos.[34] El error no se cometió.
b. Naves estructurales
Según las especificaciones técnicas del RFP, las naves es-tructurales no debían ser menos de 30 x 30 pies. Bird y Ma-ranello argumentaron que STZ incumplió con las dimensiones requeridas para las naves estructurales del edificio.
Bird alegó que STZ solamente cumplió con la nave estruc-tural destinada para el área de la administración, pero incum-plió con las dimensiones del resto de las naves estructurales. Según sus argumentos, Roig tampoco cumplió con este crite-rio, ya que propuso naves estructurales de 18 x 30 pies y 25 x 25 pies.
Por otro lado, Maranello sostuvo que el propio consultor ex-terno de la O.A.T. indicó en el informe de evaluación técnica, que STZ no cumplió con las medidas para las naves estructurales.
*803 La O.A.T., por su parte, sostiene que STZ proveyó una ex-plicación detallada para la desviación de las dimensiones, que fueron aceptadas conforme a la instrucción Núm. 1 del RFP. STZ propuso una nave estructural de 30 x 30 pies, y un edifi-cio de salas de 24 x 36 pies. El Comité Evaluador determinó que STZ cumplió con las medidas requeridas en el RFP y ex-presó lo siguiente:
“En la propuesta de STZ aparecen varias áreas sin construc-ción que pudieran utilizarse para ampliación futura, aparte de construir un piso adicional a los edificios. El diseño propone tres edificios: administración, salas y otros espacios y estacionamiento. El edificio de administración tiene naves de 30 x 30 pies. El edificio de salas y otros espacios relacionados tiene espacialmente variables entre 12 x 36 pies, modulados para un diseño eficiente, particularmente de las salas. El edi-ficio de estacionamiento tiene espaciamientos de 21, 26 y 59 pies, adecuados para el uso propuesto”.[35]
Los argumentos de Maranello y Bird fueron correctamente evaluados y adjudicados por la O.A.T. La variación en la pro-puesta de STZ fue explicada y evaluada por el Comité Evaluador. No existe razón para variar la puntuación que ob-tuvo STZ en este criterio.

b. Certificación del edificio como Green Building

Antes de entrar a discutir el error señalado por Maranello, es importante que aclaremos los formularios que se utilizaron para evaluar el cumplimiento con este criterio.
Conforme a los argumentos de la O.A.T., los proponentes realizaron una autoevaluación sobre las características “pro ambientales” de sus respectivos edificios y la incluyeron en sus propuestas. Los proponentes utilizaron dos formularios estandarizados. En el apéndice del RFP se incluyó el formula-rio 2.1, pero algunos proponentes sometieron la autoevalua-ción utilizando el formulario 3.0. El Comité Evaluador evaluó el cumplimiento de Green Building y tomó en consideración ambos formularios.
En el recurso de revisión, Maranello cuestionó la puntua-ción que obtuvo en el criterio de Green Building mediante una comparación con la puntuación que obtuvo Roig en este mismo renglón. Maranello alega que, conforme al formulario 3.0, su diseño obtuvo 53 puntos, por lo que fue clasificado en la cate-goría plata. En cambio, Roig utilizó el formulario 2.1 y fue clasificado en la categoría oro, a pesar de que obtendría una *804 puntuación similar a la que Maranello obtuvo bajo el formu-lario 3.0. Ante ello, alega que si la propuesta de Roig hubiera sido evaluada bajo del formulario 3.0, Roig hubiese obtenido su misma puntuación, es decir, ambas propuestas se coloca-rían en la categoría plata. En virtud de lo anterior, Maranello argumenta que la O.A.T. erró al asignarle 8 puntos a Roig, como resultado de la reconsideración, mientras que su pun-tuación solo aumentó a 7 puntos.
Según los argumentos de la O.A.T., durante el proceso de evaluación existieron discrepancias en los sistemas de puntos que se incluyeron en los dos formularios para las categorías de certified silver, gold y platinum. Ante tales discrepancias, el Comité evaluó el cumplimiento con el criterio de Green Building, comparándolo con “la categoría de certificación que, se-gún la información y [los] documentos que sometieron cada uno de los proponentes, obtendrían sus respectivos diseños. Esto independientemente de la cantidad de puntos que recla-man obtener.” [36]
De la solicitud de reconsideración de Maranello surge que, en aquella ocasión, este licitador cuestionó su puntuación com-parándola con la calificación que obtuvo Bird en la clasifica-ción plata.[37] Nada argumentó Maranello en cuanto a la pun-tuación que obtuvo Roig.
Inicialmente, el Comité Evaluador evaluó los argumentos de Maranello en los informes del 2 de agosto y 12 de noviembre de 2010, y mantuvo los 6 puntos que se le asignó en este criterio.[38] Ahora bien, la puntuación de Maranello se corrigió en el informe del 20 de diciembre de 2010, para ajustarla a las puntuaciones que obtuvieron los demás proponentes en la ca-tegoría plata. En este informe, la Oficina de Asuntos Legales recomendó lo siguiente:
“(11) Certificación del edificio como uno ‘Green Building*
Luego de evaluar la información suministrada y siendo con-sistente con el análisis que llevo a cabo el Comité en la eva-luación del cumplimiento con este criterio se recomienda ajus-tar la puntuación obtenida por Maranello y aumentarla de 6 a 7 puntos, la cual fue la puntuación que recibieron las demás propuestas que indicaron lograr una certificación (‘silver’). De igual forma, y por los mismos fundamentos, se recomienda *805 ajustar la puntuación otorgada en este criterio a Desarrollos Roig de 6 a 8 puntos, la cual fue la puntuación obtenida por la otra propuesta que indicó cumplimiento para lograr una cer-tificación oro (‘gold’).”[39]
De lo anterior surge que la puntuación inicial que obtuvo Maranello se corrigió en reconsideración. No empece a ello, Maranello reclama un nuevo reajuste en su puntuación, esta vez, comparándola con la puntuación que obtendría Roig si se utiliza el formulario 3.0. No podemos avalar tales argumentos.
Maranello no nos coloca en posición de evaluar sus planteamientos. En primer lugar, no especificó cuál fue el cál-culo y los criterios que tomó en consideración para sostener que la puntuación de su diseño era la misma que obtuvo Roig en el formulario 3.0. Tampoco hace referencia, ni discute cuá-les fueron las discrepancias entre ambos formularios. Más aim, los cuestionamientos que realiza Maranello sobre la pun-tuación y clasificación que obtuvo Roig en la certificación de Green Building, se presentan por primera vez en el recurso de revisión. No podemos cambiar la puntuación que le asignó el Comité Evaluador a base de meras alegaciones. Le corres-ponde al que impugna una decisión administrativa ponernos en condiciones para evaluar sus planteamientos. El error no se cometió.
5. Calidad y funcionamiento del estacionamiento,
Bird impugnó la puntuación que obtuvo STZ en este crite-rio, bajo los siguientes fundamentos: (1) la cantidad de los es-tacionamientos solicitados en el RFP fue ilegal, si se toma en consideración la cantidad de espacios que requiere el Regla-mento Núm. 4 de la Junta de Planificación, según la cabida del edificio; [40] (2) STZ propuso 548 espacios de estacionamien-tos, lo que constituye 92 estacionamientos menos al número requerido por la Junta de Planificación; (3) la O.A.T. erró al no tomar en consideración que la cantidad de espacios de estacio-namientos tiene que cumplir con la reglamentación vigente; (4) el cálculo de arrendamiento propuesto por STZ fue incorrecto.
Maranello, por su parte, reiteró que la propuesta de cons-trucción del edificio de estacionamiento de STZ fue en hormi-gón postensado, lo cual incumplió con las especificaciones es-tablecidas en el RFP
*806 Al evaluar este criterio, el Comité Evaluador asignó 10 pun-tos a Bird y a STZ, mientras que Maranello obtuvo 9 puntos. Roig, por su parte, obtuvo 7 puntos. En el informe del 20 de diciembre de 2010 (donde se resumieron las recomendaciones del Comité Evaluador sobre este asunto) la Oficina de Asuntos Legales indicó lo siguiente:
“Como ya se ha discutido anteriormente, el documento de RFP indica que se requieren 242 estacionamientos para em-pleados y jurados y 240 para visitantes. La propuesta de STZ incluyó 260 espacios para empleados y 243 para visitantes, por lo que cumplió con lo requerido. Si en [el] proceso de per-misos, alguna agencia requiere espacios de estacionamientos adicionales, esto sería un cambio en el diseño que el propo-nente seleccionado deberá cumplir como parte del proceso de desarrollo del proyecto.
Como ya se ha señalado, el Comité entiende que la opinión sobre el número de espacios de estacionamientos que requería el proyecto del proponente seleccionado, según la reglamenta-ción vigente es incorrecta ya que toma en consideración el nú-mero de pies cuadrados total y no los pies cuadrados netos. No obstante, los requisitos de cantidad de espacios de estaciona-mientos que tenga que cumplir el proyecto seleccionado du-rante el proceso de diseño y permisos no fue parte de la eva-luación del cumplimiento de este criterio. En este criterio tanto, STZ como Bird Interplan obtuvieron la máxima puntua-ción de 10 puntos”.[42]
El razonamiento del Comité Evaluador se fundamentó en la premisa de que en la etapa inicial del proceso de evaluación de las propuestas para designar el orden de preferencia, no se evaluó si la cantidad de espacios de los estacionamientos pro-puestos cumplía o no con la reglamentación vigente. Ello, toda vez que la evaluación de este aspecto se dejaría para una etapa posterior. Además, concluyó que los argumentos de Bird en torno a la cantidad de los estacionamientos requeridos por el reglamento es incorrecta, toda vez que se fundamentó en una premisa equivocada, a saber, calculó el número total de pies cuadrados y no contempló los pies cuadrados netos. Por tales razones, el Comité Evaluador descartó los argumentos de que el número de los estacionamientos requeridos, violó el Reglamento de la Junta de Planificación.
No hemos encontrado arbitrariedad en las conclusiones del Comité Evaluador. La etapa preliminar en la que se encuentra el proyecto no requiere que se evaluara si el número de esta- *807 cionamientos cumple o no con las requisitos reglamentarios de la Junta de Planificación. Precisamente, el proceso de la su-basta informal y el mecanismo del RFP permiten que las par-tes entren posteriormente, en un proceso de negociación donde se pueda aclarar las especificaciones del proyecto y se atienda el cumplimiento de los requisitos reglamentarios inherentes a la práctica de la construcción y la ingeniería. El error no se cometió.
Aclarado lo anterior, examinemos los criterios que el Comité Evaluador consideró para evaluar la calidad y el funciona-miento de los espacios de estacionamientos que propusieron los proponentes.
El expediente refleja que algunos proponentes sometieron estacionamientos en superficie o terreros, mientras que otros propusieron edificios de estacionamientos cerrados o parcial-mente techados. El Comité Evaluador no favoreció necesaria-mente el estacionamiento multipisos sobre el estacionamiento terrero, pues ambos modelos tienen sus ventajas y desventajas y eso se reflejó al comparar las propuestas y puntuaciones otorgadas. El Comité Evaluador evaluó las ventajas y desven-tajas de cada uno de los diseños propuestos y asignó la pun-tuación correspondiente.[43] El criterio de la calidad y funciona-lidad de los estacionamientos se evaluó conforme a la información que proveyó cada uno de los proponentes.
En relación con la propuesta de Maranello, el Comité Eva-luador le asignó 9 puntos. Maranello propuso un estaciona-miento terrero con capacidad para 528 vehículos, 242 emplea-dos y jurados, 240 para visitantes, 16 estacionamientos para jueces y 30 estacionamientos para autos oficiales.[44] Además, propuso un estacionamiento parcialmente techado y cerrado para 16 jueces. No obstante, el Comité Evaluador concluyó que en los planos de la propuesta, Maranello mostró una dis-tribución distinta. Esta conclusión no fiie rebatida por Mara-nello en su recurso de revisión.
STZ, por su parte, propuso un edificio techado con 243 es-tacionamientos para empleados, 260 para visitantes, 15 quince estacionamientos para los jueces y 42 estacionamientos para vehículos oficiales, para un total de 560 estaciona-mientos.[45] El Comité Evaluador le asignó 10 puntos.
*808 Bird, en cambio, propuso 789 espacios de estacionamientos, incluyendo 383 para empleados, 303 para visitantes, 38 para impedidos, 15 espacios para jueces, 45 para vehículos oficiales.[46] El estacionamiento de jueces sería en el sótano y en un espacio techado y cerrado. El estacionamiento para vehícu-los oficiales sería en un espacio abierto, lo que incumplió con las especificaciones del RFP, que requería que estuviera en un área cerrada.[47] El Comité Evaluador también le asignó 10 puntos.
Un examen del expediente y los informes de la O.A.T. de-muestran que las puntuaciones que se asignaron en este cri-terio no fueron arbitrarias ni irrazonables. En ausencia de una clara justificación, no sustituiremos el expertise del Co-mité Evaluador al evaluar este criterio.
6. Historial de cumplimiento en el desarrollo de otros proyec-tos similares al propuesto.
En relación con este criterio, Maranello argumentó que la O.A.T. no tomó en consideración el historial de cumplimiento de los proponentes, sino su experiencia. Señaló que la expe-riencia no fue un criterio que se incluyó en el RFP. Ante ello, alegó que no se podía evaluar el historial de cumplimiento a base de la experiencia. En la alternativa, Maranello adujo que si el criterio hubiera sido la experiencia, su equipo de trabajo tenía suficiente experiencia en la construcción del Centro Judicial de Carolina, por lo que su puntuación debía ser aún mayor.
Contrario a los argumentos de Maranello, el expediente re-fleja que el aspecto de la experiencia fue un elemento presente desde el extrínseco al momento de evaluar el criterio del his-torial de cumplimiento. Para evaluar este historial, necesaria-mente se tuvo que hacer un análisis sobre la experiencia de los proponentes en el diseño, la construcción, el financiamiento y el arrendamiento de proyectos similares al Centro Judicial de Aibonito. Ambos aspectos no son excluyentes. Por lo tanto, no podemos avalar los planteamientos de Maranello al señalar que el aspecto de la experiencia fue un criterio que no se in-cluyó en el RFP.
El Comité Evaluador, al evaluar el criterio del historial de cumplimiento, no solo tomó en consideración la construcción previa de un proyecto similar al del Centro Judicial de Aibo-nito, sino que evaluó aquellos proyectos que incluyeron el diseño, construcción, financiamiento y arrendamiento de un edi- *809 fico público. Si el proyecto similar fue desarrollado para la O.A.T., se le asignaba una puntuación mayor al proponente. Así lo refleja el informe del 12 de noviembre de 2010, donde el Comité Evaluador aclaró los criterios que se tomaron en con-sideración para evaluar el historial de cumplimiento en pro-yectos similares. Al respecto, se indicó lo siguiente:
“Para evaluar el historial de cumplimiento del desarrollador con ... otros proyectos similares realizados, el Comité analizó, conforme a la información suministrada en cada una de las propuestas sometidas, la experiencia de cada equipo partici-pante en cada componente y etapa del desarrollo de un pro-yecto: desarrollador, diseñador, contratista o constructor y ad-ministrador y operador. Además [s]e evaluó la experiencia especifica en proyectos de naturaleza pública-privada, particu-larmente en la modalidad de proyectos de instalaciones públi-cas y de ser aplicable, e[x]periencia previa con el desarrollo de instalaciones para el Tribunal General de Justicia. Utilizando estos elementos, el Comité entonces evaluó de forma compara-tiva las propuestas y ello se refleja en la puntuación otorgada a cada una de ellas.”[48]
Surge de los tres informes en reconsideración que la O.A.T. evaluó los argumentos de Maranello. A pesar que Maranello mencionó varios proyectos de desarrollo residenciales en Puerto Rico y en Estados Unidos, no proveyó los detalles de cada proyecto. El Comité Evaluador concluyó que Maranello no sometió un proyecto que evidenciara su experiencia en el desarrollo, construcción y el arrendamiento con opción a com-pra de un edificio similar al Centro Judicial de Aibonito. De hecho, cuando se evaluó los argumentos de Maranello en el informe del 20 de diciembre de 2010, la Oficina de Asuntos Legales señaló lo siguiente sobre su propuesta:
“Experiencia y capacidad del equipo:
El equipo de construcción tiene.experiencia y recursos. No se evidenció experiencia de desarrollo de proyectos de diseño, construcción, financiamiento y operación”.[49]
Por el contrario, STZ contaba con proyectos similares reali-zados para la O.A.T., mientras que Bird sometió evidencia de un proyecto similar para la Corporación del Fondo del Seguro del Estado.[50] Lo anterior evidencia que la puntuación asig- *810 nada a Maranello está fundamentada en información sustan-cial que obra en el expediente administrativo, por lo que no intervendremos con la evaluación del Comité Evaluador.
Por otro lado, Bird cuestionó que se disminuyera la califica-ción que obtuvo en el criterio del historial de cumplimiento de 9 a 8 puntos, como resultado del proceso de reconsideración. Sostuvo que Bird Construction es socio integrante de Bird In-terplan y que el primero fue el que construyó los centros judi-ciales de Humacao, San Juan y Bayamón.
Del informe del 2 de agosto de 2010 surge que el Comité Evaluador atendió los argumentos de Bird y concluyó que dicha entidad sometió un solo proyecto similar al Centro Judicial de Aibonito. Sobre este particular, el Comité Evaluador indicó lo siguiente:
“Se sometió un solo proyecto de diseño-construcción-finan-ciamiento-arrendamiento, para una agencia que no es Tribunales. Se le dio la segunda evaluación más alta sola-mente por debajo de dos proponentes con extensa experiencia con la Administración de los Tribunales y por encima de otro licitador con experiencia.” [51]
Bird obtuvo una calificación de 9 puntos, puesto que sola-mente sometió un proyecto similar al del Centro Judicial de Aibonito, que contempló el diseño, construcción, fínancia-miento y arrendamiento para una agencia que no era la Rama Judicial. Ello, contrario a los proyectos sometidos por STZ y Roig, quienes contaban con un historial de proyectos similares para la OAT y otras agencias públicas.[52] Roig fue el desarro-llador del Centro Judicial de Humacao, mientras que STZ con-taba con varios proyectos similares realizados para la OAT y para otras agencias gubernamentales.[53] El historial de Roig y STZ en proyectos similares para la O.A.T. no fue rebatido por Bird en su recurso de revisión.
Cabe destacar que en el informe del 20 de diciembre de 2010, la Oficina de Asuntos Legales le restó un punto a la calificación inicial de Bird, porque el proyecto que sometió fue desarrollado para otra agencia distinta a la O.A.T. El informe refleja lo siguiente:
“Como parte de esta revisión del proceso de evaluación de *811 propuestas se recomienda un ajuste en la puntuación original-mente otorgada a Desarrollos Roig en este criterio de expe-riencia en proyectos similares. De conformidad al análisis que llevo a cabo el Comité, los proponentes con experiencia en el desarrollo de proyectos ..., diseño, construcción, financia-miento y operación de instalaciones públicas obtuvieron la mayor puntuación. Si los proyectos eran específicamente para la OAT la puntuación era todavía mayor. En consideración a estos criterios se recomienda entonces otorgarle dos puntos adicionales a la propuesta de Desarrollos Roig y aumentar sus puntos de 7 a 9 puntos, ya que Desarrollos Roig presentó su experiencia como desarrollador de una instalación para la OAT, el Centro Judicial de Humacao. Noravi y STZ, los cuales tienen varios proyectos de desarrollo de Centros Judiciales y de otras instalaciones públicas obtuvieron 10 puntos. En cuanto a Bird, que presentó un proyecto de desarrollo para otra agencia pública distinta a la OAT se recomienda entonces re-ducir su puntuación de 9 a 8 puntos.[54] (Enfasis suplido.)”
Analizado lo anterior, concluimos que la puntuación que ob-tuvo Bird en el criterio de Historial de cumplimiento fue razonable. No hay indicio de arbitrariedad o abuso de discre-ción en las puntuaciones asignadas. El expediente administra-tivo refleja evidencia sustancial que apoya el análisis y las puntuaciones obtenidas, por lo que debemos dar deferencia al expertise que la O.A.T. ejerció al evaluar este criterio.
7. Estructura administrativa
Maranello cuestionó la diferencia de un punto que obtuvo su propuesta en comparación con la propuesta de STZ. Marane-llo obtuvo 8 puntos, mientras que STZ obtuvo 9 puntos. Alegó que en el Informe Técnico, el consultor externo de la O.A.T. reveló que la propuesta de Maranello fue superior a la de STZ. Según los argumentos de Maranello, su propuesta contempló los servicios de mantenimiento de una compañía que tenía más de 20 años de experiencia, un equipo de 3 técnicos de mantenimiento y un número de teléfono para reparaciones disponibles las 24 horas. No obstante, la propuesta de STZ solo incluyó a un supervisor y a un empleado de manteni-miento y no especificó el término para las reparaciones.
En el Informe de Evaluación Técnica no encontramos fun-damento que sustente las alegaciones de Maranello. De hecho, en relación con la propuesta de Maranello, el consultor ex-terno de la O.A.T., el ingeniero Herrera, señaló que la pro-puesta “se ofrece mantenimiento para diversas áreas, pero no *812 se mencionan los sistemas eléctricos y mecánicos, protección de incendios, ascensores, distribución de agua, entre otros omitidos.” [55] El texto del informe no indica que la propuesta de Maranello sea superior a la de STZ.
Por otro lado, la propuesta de STZ contempló el manteni-miento de los equipos y sistemas instalados y la contratación de una compañía independiente para la administración y ope-ración de la propiedad. Especificó, además, que proveería un mantenimiento a “todos los equipos Sistema A/C, Sistema Eléctrico incluyendo generadores, sistema de protección contra incendios, equipos edificios inteligente, elevadores, plome-ría, etc.” [56] También se comprometió a gestionar todos los con-tratos de mantenimiento para los equipos especializados.
El Comité Evaluador, en respuesta a los planteamientos de Maranello, señaló que la experiencia de cada proponente fue considerada al evaluar la estructura administrativa y el pro-grama de mantenimiento, particularmente, en proyectos de desarrollo de instalaciones públicas para tribunales y otras agencias. El criterio de evaluación fue similar al análisis que se utilizó en el historial de cumplimiento. Es decir, en adición a los aspectos del mantenimiento que se incluyeron en las pro-puestas, el Comité Evaluador consideró la experiencia de los proponentes. Concluyó que STZ brindaba un mantenimiento aceptable en varias facilidades de la O.A.T., mientras que Bird brindaba un buen mantenimiento al Fondo del Seguro del Estado. Como resultado de la evaluación, se le asignó igual puntuación a Maranello y a Bird, y un punto más alto a STZ.[57] No encontramos arbitrariedad en la puntuación asignada. El error no se cometió.
8. Omisión de información en la propuesta de STZ sobre as-pectos técnicos del proyecto
a. Uso de materiales de primera calidad y otras especificaciones.
Tanto Bird como Maranello alegan que STZ omitió informa-ción importante sobre ciertos aspectos técnicos del proyecto. Ambos alegan que STZ no cumplió con las especificaciones requeridas en el RFP.
Específicamente, Bird alega que STZ no especificó la cali-dad de los materiales que utilizaría. Por su parte, Maranello argumenta que STZ no especificó los detalles del sistema de *813 aire acondicionado, plomería, relación de áreas y usos, sistema mecánico, escaleras, ascensores al público, ascensores de jue-ces, ascensores para confinados, sistema central de incendios y en torno al sistema de supresión de incendios.[58] Sostiene, además, que tales deficiencias fueron señaladas en el Informe de Evaluación Técnica.
En relación con los planteamientos de Bird y Maranello, el Comité Evaluador concluyó que el RFP no requería que se incluyeran todos los detalles y especificaciones del proyecto en las propuestas. Tampoco se requirió a ninguno de los propo-nentes que detallara todos y cada uno de los materiales que utilizaría, ya que la información que se sometió en todas las propuestas fue preliminar. Las otras propuestas tampoco in-cluyeron los detalles de los materiales propuestos.
La Oficina de Asuntos Legales reiteró las conclusiones del Comité Evaluador en el informe del 20 de diciembre de 2010. Allí se especificó que los proponentes incluyeron la informa-ción general sobre el uso de materiales de primera calidad en la etapa conceptual y esquemática del desarrollo del proyecto. Por ejemplo, la propuesta de STZ incluyó un listado de “todas las terminaciones y materiales, tanto exteriores como interio-res que se proponen en [el] diseño del centro judicial.” [59]
El Comité Evaluador concluyó que ninguna de las propues-tas cumplió totalmente con los requisitos del RFP. Varias de las propuestas, incluyendo la de STZ, omitieron alguna infor-mación técnica.[60] No obstante, el Comité Evaluador determinó que la información que sometieron los licitadores fue sufi-ciente para evaluar sus propuestas y designar el orden de preferencia. Ello, toda vez que la omisión de cierta informa-ción técnica o algún documento específico del proyecto, sería considerado en la etapa de revisión del diseño final de la pro-puesta seleccionada. Concluyó el Comité Evaluador que los documentos y los planos que se sometieron junto con las pro-puestas fueron preliminares y esquemáticos, por lo que no se tenía que proveer todos los detalles del proyecto en esta etapa. Los detalles de las especificaciones se someterían posterior-mente durante el proceso, en la etapa de diseño.[61]
Los argumentos de Maranello fueron atendidos detallada-mente en el informe del 20 de diciembre del 2010. En el in-forme, la Oficina de Asuntos Legales resumió la postura del Comité Evaluador y expresó lo siguiente:
“Maranello no indica específicamente la naturaleza del ale- *814 gado incumplimiento en los doce asuntos mencionados. Según se ha discutido, ninguna de las propuestas sometidas cumplió estrictamente con todos y cada uno de los requisitos y/o infor-mación solicitada en el documento de solicitud de propuestas, aunque en la mayoría de ellas se cumplió sustancialmente con los requisitos fundamentales del RFP. En cada uno de los aná-lisis y resúmenes de las propuestas incluido en el Informe de Evaluación Técnica hay una lista de comentarios sobre aque-llos criterios de diseño que no se cumplen o falta información. La evaluación de las propuestas que llevo a cabo el Comité, sin embargo, fue una comparativa y teniendo en cuenta la totali-dad de la propuesta presentada. Como ya se ha señalado, los documentos sometidos por cada uno de los proponentes rela-cionados con el diseño del proyecto son de tipo preliminar y no contienen los detalles que aparecerán más adelante en los do-cumentos de construcción. La falta de alguna información o documento especifico se considerara en la etapa de revisión de diseño final de la propuesta seleccionad. Ninguna de las pro-puestas recibidas cumplía total y completamente con los re-quisitos del RFP, incluyendo la propuesta de Maranell”.[62]
Según las determinaciones del Comité Evaluador, ni Bird ni Maranello cumplieron cabalmente con todos los requisitos del RFP. El resto de los licitadores tampoco cumplieron con todas las especificaciones requeridas.[63] Somos del criterio que las determinaciones del Comité Evaluador se encuentran sosteni-das en los documentos que obran en el expediente de la subasta.
Por ejemplo, en la propuesta de Bird, el sistema de aire acondicionado no cumplió con los requisitos del RFP. Un sis-tema similar fue instalado en la O.A.T., por lo que dicho orga-nismo había teñid [o] la oportunidad de evaluar su funcionamiento.[64] Tampoco sometió una descripción detallada del sistema de aire acondicionado, ya que los planos —al igual que el resto de las propuestas— fueron esquemáticos. De igual forma, en el Informe de Evaluación Técnica se especificó que *815 Bird no especificó los materiales que utilizaría en los sistemas electrónicos, plomería y mecánicos.[65]
Otro ejemplo del incumplimiento con los requisitos del RFP fue que Bird proveyó un espacio de estacionamiento abierto para los vehículos oficiales, pero en el RFP se requirió que este espacio fuera cerrado.[66] Bird tampoco proveyó una explicación que validara algunas de sus respuestas en el formulario de Green Building, donde obtuvo una certificación plata.[67] In-cluso, los planos eléctricos y mecánicos tenían letras en ta-maño tan reducido que resultaron difícil leer y entenderlos. Por otro lado, aunque Bird detalló el número de elevadores, el consultor externo expresó que “durante la etapa de diseño, si es que se selecciona esta propuesta, se podrá definir el cum-plimiento con los otros requisitos del RFP.” [68]
Maranello tampoco cumplió con todas las especificaciones del RFP. Por ejemplo, el consultor externo de la O.A.T. señaló que de escogerse esta propuesta, era necesario que se reali-zara unos ajustes en la distribución de algunos espacios del edificio.[69] Maranello tampoco sometió los planos que mostra-ban la distribución e iluminación del edificio y omitió ciertos aspectos relacionados a la escorrentía pluvial, entre otras especificaciones. Su memorial estructural fue limitado y no sometió los planos estructurales.[70] De igual forma, en el in-forme del 2 de agosto de 2010, el Comité Evaluador determinó que algunos de los créditos que Maranello reclamó para la obtención de la clasificación de Green Building, no le aplica-ban.[71]
Los ejemplos señalados evidencian que no se requería que los proponentes detallaran todas y cada una de las especifica-ciones y aspectos técnicos de sus propuestas. Incluso, el RFP limitó la cantidad de páginas que debían incluirse en la pro-puesta a 20 hojas. También se limitó la cantidad de planos.[72] El cumplimiento con el límite de páginas y los planos requeri- *816 dos fue validado por el Comité Evaluador. Por ejemplo, del Informe de Evaluación Técnica surge que no se consideró aquellos planos que Bird sometió en exceso al número de pla-nos permitidos por el RFP.[73] De igual forma, STZ no sometió los detalles de la alternativa de acero y hormigón en la cons-trucción del estacionamiento ante la limitación en la cantidad de las páginas requeridas por el RFP.
El expediente demuestra que desde el inicio del proceso de evaluación, el consultor externo de la O.A.T. tomó en conside-ración el hecho de que los planos y documentos que se some-tieron en las propuestas fueron esquemáticos. Así surge del informe de Evaluación Técnica, donde se incluyó un listado de las consideraciones generales que se realizaron cuando se compararon las propuestas. Los señalamientos al respecto fueron las siguientes:
“5. Consideraciones hechas en el estudio.
5.1 Todas las propuestas sometidas incluyen información descriptiva, incluyendo escrito y planos.
5.2 Debido a que los planos preparados son de carácter es-quemático, no muestran toda la información necesaria para una evaluación detallada.
5.3 En algunas propuestas la información sometida no es suficiente para la evaluación preliminar y se enumeran en los comentarios de cada propuesta. Durante la etapa de negocia-ción con el proponente que se seleccione, será necesario discu-tir en detalle varios aspectos, para asegurarse que se cumplen las necesidades de la OAT.
5.4 No se ha evaluado si las propuestas cumplen con todas las disposiciones de los reglamentos aplicables, ya que debido a ser documentos esquemáticos no se incluye toda la informa-ción necesaria. En la etapa de negociación con el licitador se-leccionado, se requerirá el cumplimiento con los reglamentos aplicables.
(Citas omitidas.)[74]
No empece a estas consideraciones, el ingeniero Herrera (asesor externo de la O.A.T.) evaluó las propuestas y concluyó que la mayoría de ellas cumplieron sustancialmente con los requerimientos del RFP.[75] Lo anterior evidencia que desde el inicio del proceso, se consideró que aunque la información que *817 se incluyó en las propuesta fueron preliminares y esquemáti-cas, fueron suficientes para evaluarlas. De hecho, en los in-forme del Comité Evaluador y en el RFP se estableció que los detalles de las especificaciones técnicas del proyecto se discu-tirían con el proponente seleccionado en la etapa de la nego-ciación y diseño del proyecto. Así lo demuestra la instrucción núm. 11 del RFP, donde se estableció el procedimiento que la OAT seguiría, una vez se anunciara el orden de preferencia para la negociación del proyecto. Sobre este particular, se in-dicó lo siguiente:
“La Oficina de Administración de los Tribunales otorgará la propuesta en forma condicionada a uno de los proponentes. Posterior al otorgamiento se iniciará un proceso de negocia-ción para:
a. Revisar los aspectos específicos del proyecto.
b. Después de confirmados, revisados y establecido el cumplimiento de todos los requisitos y criterios, se determina si la Oficina de Administración de los Tribunales y el propo-nente o desarrollador seleccionado están en posición de nego-ciar un contrato.
c. Si durante el proceso de negociación con el proponente o desarrollador seleccionado se encuentra que hay un obstáculo, impedimento o dificultad que no permita la continuación de la negociación, la Oficina de Administración de los Tribunales recurrirá al segundo proponente o desarrollador para iniciar nuevamente el proceso de negociación, o se cancela la Solici-tud Propuesta en su totalidad.
d. La fecha de confirmación de todos los requisitos nece-sarios para la contratación, incluyendo el título u opción de compra del terreno, revisión de todos los elementos de cons-trucción y financiamiento, canon de arrendamiento, aproba-ciones y permisos iniciales requeridos, será determinada más adelante en el proceso.
e. Una vez finalizadas las negociaciones, los acuerdos se incluirán en el contrato para el desarrollo, construcción y arrendamiento del Nuevo Centro Judicial de Aibonito”.[76]
Un examen del expediente revela que el Comité Evaluador evaluó la información que proveyó cada licitador en torno a los materiales y la consideró suficiente para designar las puntua-ciones en este criterio.[77] A diferencia de una subasta formal, el RFP permite un proceso activo de negociación entre las partes y un mayor grado de flexibilidad para atender los asuntos es- *818 pecíficos y cuestiones técnicas del proyecto. No hemos encon-trado fundamento para variar las puntuaciones asignadas por la O.A.T. en este criterio. El error no se cometió,
c. Evidencia sobre la posesión del terreno
Maranello alega que el RFP requirió que los proponentes evidenciaran la posesión del terreno, por medio de una certi-ficación registral o un contrato de opción de compraventa. Sos-tiene que STZ no cumplió con este requisito, ya que sometió un contrato de promesa de compraventa cuya fecha de venci-miento fue el 31 de mayo de 2010. Argumenta que al momento de adjudicarse el orden de preferencia, a saber, el 14 de junio de 2010, STZ no contaba con un contrato que estuviera vi-gente, ni tampoco evidenció su renovación.[78] No le asiste la razón en sus planteamientos.
Según las especificaciones del RFP, el proponente o desarro-llador tenía que incluir en la propuesta “terrenos en su pose-sión, opcionados o a comprar que sean accesibles a las vías públicas principales de la ciudad de Aibonito.” [79] Conforme a la instrucción núm. 11 del RFP, una vez se iniciara el proceso de negociación con el proponente seleccionado, “[l]a fecha de confirmación de todos los requisitos necesarios para la contra-tación, incluyendo el título u opción de compra del terreno, .... será determinada más adelante en el proceso.”
Si bien es cierto que el proponente, al momento de presentar la propuesta, tenía que demostrar que los terrenos estaban disponibles para ser adquiridos, la etapa donde se tiene que corroborar el título u opción de compraventa del terreno es luego de que se inicie la etapa de la negociación y diseño, se-gún el orden de preferencia designado.
STZ tenía vigente un contrato de promesa de compraventa para la fecha en que presentó su propuesta y cumplió con las especificaciones del RFP. La renovación del contrato o los do-cumentos que evidencien la titularidad del terreno, se presen-tarán en la etapa de la negociación y diseño del proyecto. Si no se cumple con este requisito, la O.A.T. podrá negociar el pro-yecto con el próximo proponente en la lista de preferencias.
9. Monto del canon de arrendamiento
a. Comparación entre la oferta de Maranello y la de STZ
Conforme al RFP el canon de arrendamiento fue uno de los 10 criterios que se consideraron cuando se evaluaron las *819 propuestas. En el RFP se especificó que, luego de 30 años de arrendamiento, la Rama Judicial tendría el derecho de adqui-rir las nuevas facilidades del Centro Judicial de Aibonito.[80]
Por lo tanto, el proponente sería responsable de “preparar y someter un diseño preliminar con sus proyecciones de costo de construcción y de financiamiento. Esto, unido al costo del te-rreno y otros aspectos económicos, le permitirá establecer el canon de arrendamiento por pie cuadrado que ofrecerá en su propuesta.” [81] La complejidad del proyecto requería que el Co-mité Evaluador analizara el precio del canon de arrenda-miento tomando en consideración varios factores, entre estos, los pies cuadrados del edificio del tribunal, el espacio y la ca-lidad del estacionamiento, el canon de mantenimiento, entre otros aspectos.
Los documentos sometidos ante nuestra consideración refle-jan que algunas de las propuestas incluyeron edificios de es-tacionamientos, mientras que otras incluyeron estacionamien-tos en superficie o raía combinación de estacionamientos en superficie y de estacionamientos techados. De igual forma, al-gunos proponentes ofrecieron un canon de arrendamiento por el edificio del tribunal y un canon de arrendamiento por el edificio de estacionamiento (multipisos), o por el estaciona-miento en superficie.[82]
STZ propuso un canon de arrendamiento mensual de $624,735 y una renta anual de $7,496,820 (ambas partidas incluyeron el componente del mantenimiento que totalizó $888,324).[83] No obstante, STZ dividió el monto del compo-nente financiero por el pie cuadrado en dos partes: (1) el edi-ficio principal, y (2) el edificio del estacionamiento. La renta por el pie cuadrado del edificio principal, sin el costo de man-tenimiento, sería de $24.50, mientras que la renta del edificio de estacionamiento sería de $16. Los pies cuadrados del área rentable sería de 171,731 p/c, más 150,068 p/c por el edificio de estacionamiento.[84]
Maranello, por su parte, propuso un canon de arrenda-miento mensual de $441,475, y un canon de arrendamiento anual de $5,297,700. Su oferta incluyó el arrendamiento del edificio principal y la renta del estacionamiento terrero. El *820 costo por el pie cuadrado sería de $30 y el área rentable sería de 176,590 p/c.[85]
En el recurso de revisión, Maranello argumentó que su oferta es más económica que la oferta de STZ. Para sustentar sus planteamientos, Maranello comparó la renta que se paga-ría durante los 30 años de arrendamiento de las facilidades bajo la oferta de STZ, y el monto que se pagaría si se escogiera su oferta. Alegó que la diferencia entre ambas ofertas sería de $65,973,600, por lo que la oferta de STZ sería 42% más cos-tosa que su oferta.86
La O.A.T., por su parte, señaló que el cálculo de Maranello es incorrecto, ya que el costo por el pie cuadrado de las facili-dades donde se ubicaría el tribunal, si se excluye el edificio de estacionamiento, sería de $24.50 en la propuesta de STZ, mientras que en la oferta de Maranello sería de $30. Ahora bien, la O.A.T. aclara que Maranello incluyó el costo del man-tenimiento en la renta por pie cuadrado, mientras que en la oferta inicial del edificio principal de STZ no se incluyó el mantenimiento. Aun así, la O.A.T. alega que, en caso de que se adjudique la partida de mantenimiento de STZ en su totali-dad al edificio del tribunal, cuya cifra sería de $888,324, el canon por el pie cuadrado del edificio principal con el mante-nimiento (excluyendo el edificio de estacionamiento), sería de $29.67.[87] Además, alega que el canon de mantenimiento en la oferta de STZ es mayor porque incluyó un edificio de estacio-namiento, mientras que en la oferta de Maranello solo se pro-puso un estacionamiento exterior en la superficie y a la intem-perie, que conlleva un menor costo de mantenimiento.
El expediente refleja que el Comité Evaluador evaluó deta-lladamente los costos de arrendamiento de las facilidades y asignó la puntuación más alta a la propuesta que sometió el canon de arrendamiento más ventajoso, y en forma descen-diente, por orden de cuantía, a los demás proponentes”.[88]
Como cuestión de hecho, el Comité Evaluador evaluó el canon de arrendamiento que se pagaría bajo la propuesta de STZ por el edificio de estacionamiento y lo incluyó en el costo total del canon mensual y anual del arrendamiento del nuevo centro *821 judicial.[89] Aun así, el Comité Evaluador le asignó a Maranello la puntuación máxima de 10 puntos, mientras que STZ solo obtuvo 4 puntos. Bird obtuvo 2 puntos porque su propuesta fue más costosa y Roig obtuvo 5 puntos.
Lo anterior evidencia que las puntuaciones que se asignaron en el criterio del monto del canon de arrendamiento tomó en consideración la cuantía del arrendamiento que propuso cada licitador. Así, la oferta de Maranello recibió una puntuación mayor por ser una oferta más económica, mientras que Bird recibió una menor puntuación por ser una oferta más costosa. La evaluación también demuestra que Maranello recibió una puntuación más alta que STZ, lo que evidencia que las cuan-tías del monto del canon de arrendamiento fueron considera-das por la O.A.T. al momento de evaluar este criterio.
Maranello, sin embargo, señala que la OAT actuó arbitra-riamente al asignar solo un 10% de valor al criterio del precio. Argumentó que la O.A.T. no podía otorgarle al precio los mis-mos puntos que se otorgaron en los otros criterios, porque esta valoración disminuyó el propósito principal de una subasta, cuyo fin es que el Estado consiga realizar la obra al precio más bajo posible.
Ciertamente, si se le asigna al criterio del precio un porcen-taje mayor al 10% del total de la evaluación, Maranello obten-dría mayor ventaja, ya que fue el proponente que obtuvo la puntuación máxima en este criterio. De hecho, en el proceso de reconsideración, Maranello propuso que el Comité Evaluador asignara al criterio del precio un 25% del valor total de la evaluación, en vez de un 10%. Ante tales planteamientos, el Comité Evaluador concluyó lo siguiente:
“Luego de una evaluación de distintas posibilidades, la OAT determinó que todos y cada uno de los diez criterios de evalua-ción establecidos debía tener el mismo peso. Ciertamente el criterio del monto del canon de arrendamiento es uno de suma importancia pero, tratándose de una instalación de la impor-tancia de un centro judicial regional, del hecho de que el mismo se desarrollará mediante un contrato de arrenda-miento a largo plazo y que el edificio pasará a manos de la OAT al final del término de arrendamiento, la importancia de la administración adecuada y el mantenimiento óptimo y efi-ciente del centro, la necesidad de calidad de su diseño y cons-trucción, entr[e] otros factores, hacen necesario que cada una de las propuestas se evalúen de acuerdo con el cumplimiento de cada uno de los criterios establecidos en el documentos de solicitud de propuestas (RFP) y que dichos criterios tengan *822 las(sic) misma importancia”.[90]
Por lo tanto, aunque Maranello obtuvo la máxima puntua-ción en el criterio del monto del canon de arrendamiento, este criterio solo fue 1 de los 10 criterios que el Comité Evaluador tomó en consideración para examinar las propuestas. La pro-puesta de Maranello obtuvo una menor puntuación en compa-ración con la propuesta de STZ en 7 de los 10 criterios que se evaluaron.
El canon de arrendamiento de STZ aparentaba ser más cos-toso que la oferta de Maranello, pero el Comité Evaluador tomó en consideración otros criterios para asignar el orden de preferencia. Los criterios se aplicaron por igual a todos los participantes. La complejidad y sofisticación del proyecto re-quiere extremo cuidado. Al asignar las puntuaciones, el Co-mité Evaluador consideró la calidad y el diseño del edificio de estacionamientos, el costo por el pie cuadrado del edificio principal y el resto de los criterios objetivos que se establecieron en el RFP. Una vez se evaluaron todos los criterios, la O.A.T. asignó el primer lugar en el orden de preferencia a STZ, puesto que su propuesta fue la más ventajosa y beneficiosa para la construcción del nuevo Centro Judicial de Aibonito. No encontramos arbitrariedad en las puntuaciones asignadas por el monto del canon de arrendamiento.
Si bien es cierto que el propósito de la subasta es lograr que el Gobierno consiga los precios más bajos, no existe una regla inflexible que exija adjudicar la subasta al postor más bajo. La agencia está facultada para rechazar la oferta más baja siem-pre que su determinación sea razonable. Empresas Toledo v. Junta de Subastas, supra, pág. 779. El mero hecho de que un licitador comparezca a una subasta y ofrezca un precio más bajo que los demás licitadores, de ninguna forma garantiza que la subasta le sea adjudicada. Existen otros factores que deben ser considerados. Especialmente, cuando se trata de un edificio que albergará las salas judiciales de una Región y que se planifica para que dure por varias decenas de años.
Los documentos sometidos ante nuestra consideración refle-jan que los aspectos técnicos, las especificaciones, los servicios y los equipos de cada propuesta fueron evaluados conjunta-mente por el consultor externo de la O.A.T., el Comité Evalua-dor y la Oficina de Asuntos Legales. La evaluación de las pro-puestas requirió un minucioso análisis de cada propuesta, más *823 un estudio comparativo con los 10 criterios especificados en el RFP, Tomando en consideración los 10 criterios del RFP, la O.A.T. concluyó que la propuesta de STZ fue la más beneficiosa.
El expertise que la O.A.T. ejerció al analizar los criterios de un proyecto tan complejo como es el nuevo Centro Judicial de Aibonito, el cual incluye el diseño, construcción, financia-miento y el arrendamiento de las nuevas facilidades, no debe ser sustituido por nuestro criterio sin tener una clara justificación.(5)
IV
Luego de examinar los errores planteados por los peti-cionarios, es necesario concluir que debido a que en el pro-ceso de evaluación de las propuestas presentadas para el desarrollo del nuevo Centro Judicial de Aibonito hubo que evaluar productos diferentes, con distintos: diseños, reque-rimientos de permisos, costos, experiencias de los desarro-lladores, propuestas de mantenimiento y operación, y loca-lizaciones distintas, resulta imposible evaluarlos única-mente a base del precio propuesto por cada proponente.
Si bien es cierto que el propósito de la subasta es lograr que el Gobierno consiga los precios más económicos, no existe una regla inflexible que exija adjudicar la subasta al postor más bajo. La agencia está facultada para rechazar la oferta más baja, siempre que su determinación sea razonable. Empresas Toledo v. Junta de Subastas, supra, pág. 779.
En el caso de autos, Maranello argumenta en su recurso que fue el postor más bajo y que el precio de STZ era 42% por encima del suyo. Esta aseveración parte de una pre-misa equivocada, pues resulta que el proyecto de Marane-llo tiene menos pies cuadrados de construcción que el de *824 STZ. Además, según el informe técnico, el canon por pie cuadrado propuesto por Maranello es de $30, mientras que el canon equivalente en la propuesta de STZ es de $24.50.(6)
Cabe señalar que el proceso de RFP validado por esta Curia en R & B Power, Inc. v. E.L.A., supra, no requiere que se haga un ejercicio exclusivamente matemático para evaluar las propuestas con el fin de establecer el orden de preferencia en la negociación. En este caso, se trata de pro-ductos que, debido a sus características peculiares, no son susceptibles de evaluarse con precisión matemática. Preci-samente esta fue la razón para que la O.A.T. utilizara el proceso de RFP para llevar a cabo la compra negociada para el desarrollo del nuevo Centro Judicial de Aibonito.
Contrario a lo que expresa la opinión disidente, este Tribunal no ignora los Informes de Auditoría del Contralor de Puerto Rico DA-12-52(7) y DA-12-53.(8) Estos informes van dirigidos a analizar los cánones de arrendamiento del edi-ficio de la OAT, el Tribunal de Apelaciones y la Sala de Relaciones de Familia y Menores del Municipio de Bayamón. Por lo tanto, responden a unos señalamientos e inquietudes que surgieron con anterioridad y que nada tie-nen que ver con el proyecto actualmente en controversia. De hecho, a pesar de que la propuesta de STZ no obtuvo la mejor puntuación en el criterio del costo de arrendamiento, esta sí resultó favorecida en otros criterios de evaluación y cumplió con todas las exigencias de ley.
La extensa documentación sometida ante este Tribunal y el Tribunal de Apelaciones refleja que los aspectos técni-cos, las especificaciones, los servicios y los equipos de cada *825 propuesta fueron evaluados conjuntamente por el consul-tor externo de la O.A.T., el Comité Evaluador y la Oficina de Asuntos Legales. La evaluación de la propuesta requirió un minucioso análisis de cada una de ellas, más un estudio comparativo de los diez criterios del RFP. La O.A.T. con-cluyó que la propuesta de STZ fue la más beneficiosa. (9) El expediente demuestra que el proceso de RFP llevado a cabo por la O.A.T. fue meticuloso, cuidadoso y equitativo; ade-más, fue conducido con el claro objetivo de identificar la propuesta más conveniente para la Rama Judicial de Puerto Rico y ajustada a las necesidades de la ciudadanía y las comunidades a las que sirve la Región Judicial de Aibonito. Por esta razón, su determinación no debe ser sus-tituida por este Tribunal en ausencia de una clara justifi-cación para ello.
V
Por los fundamentos expuestos, confirmamos la senten-cia recurrida. En consecuencia, se sostiene el orden de pre-ferencia para la negociación del nuevo Centro Judicial de Aibonito, tal y como fue alterada por el Tribunal de Apela-ciones, y así modificada, se confirman las determinaciones de la O.A.T.
Lo acordó y manda el Tribunal y lo certifica la Secreta-ria del Tribunal Supremo. La Jueza Asociada Señora Pa-bón Charneco emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Feliberti Cintrón. El Juez Pre-sidente Señor Hernández Denton se inhibió.

 El 3 de mayo de 2011, el Tribunal de Apelaciones emitió una resolución en la que señaló que el asunto sobre la desestimación del alegato de Roig se atendería en la sentencia sobre los recursos de revisión previamente consolidados.

 Esta ley no está codificada en L.P.R.A., pero aparece como una nota en la sección “Disposiciones Especiales” en el Historial de 4 L.P.R.A. sec. 24j n. Véase la ley. íntegra en el Apéndice del memorando de la O.A.T., págs. 665-666.

 Véase el Apéndice del memorando de la O.A.T., CC-11-892, pág. 701.

 Véanse, además: Otero v. Toyota, 163 D.P.R. 716, 727 (2005); Pacheco v. Estancias, 160 D.P.R. 409, 432 (2003); Rivera Concepción v. A.R.Pe., 152 D.P.R. 116, 122 (2000).

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 374.

 Véase: Ilustración en el Informe de Evaluación Técnica, Apéndice de O.A.T., pág. 187.

 Apéndice de O.A.T., Informe de 20 de diciembre de 2010, págs. 600-601. Véase, además: Informe de 2 de agosto de 2010, págs. 476-477, 487; Informe de 12 de noviembre de 2010, págs. 514-515 y 528-530; Informe de 20 de diciembre de 2010, págs. 573-574, 567 y 599.

 Apéndice de OAT, Informe de 20 de diciembre, pág. 599.

 Apéndice de OAT. pág. 600.

 Apéndice de O.A.T., Informe de 20 de diciembre de 2010, págs. 600-601. Véase, además: Informe de 2 de agosto de 2010, págs. 476-477 y 487; Informe de 12 de noviembre de 2010, págs. 514-515 y 528-530; Informe de 20 de diciembre de 2010, págs. 573-574, 567 y 599.

 Apéndice de O.A.T., págs. 577-580.

 Este caso fue resuelto por el panel de jueces integrado por el Hon. González Vargas (juez ponente), Hon. Soler Aquino y la Hon. Carlos Cabrera.

 Panel integrado por los jueces Rivera Román (juez ponente), Fraticelli Torres, Hernández Sánchez y Ramos Torres.

 Panel integrado por los jueces González Vargas (juez ponente), Soler Aquino y Carlos Cabrera.

 Apéndice de O.A.T., pág. 6.

 Apéndice de O.A.T., págs. 238, 276, 317.

 Apéndice de O.A.T., Informe de 2 de agosto de 2010, págs. 477-478.

 Apéndice de O.A.T., Informe de 12 de noviembre de 2010, págs. 515-516, 531.

 Apéndice de O.A.T., pág. 42.

 Apéndice de O.A.T., pág. 13.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 188.

 Apéndice de O.A.T., pág. 19.

 Véase: Apéndice de O.A.T., Informe de 2 de agosto de 2010, pág. 489; In-forme de 12 de noviembre de 2010, págs. 532-533; Informe de 20 de diciembre de 2010, págs. 575 y 605.

 Apéndice de O.A.T., Informe de 2 de agosto de 2010, pág. 489. Tales deter-minaciones se reiteraron en el Informe de 12 de noviembre de 2010, págs. 519, 527 y 532-533, así como en el Informe de la Oficina de Asuntos Legales de 20 de diciembre de 2010, págs. 585, 605.

 Informe de 2 de agosto de 2010, Apéndice de O.A.T., pág. 477. Véase, además: Apéndice de O.A.T., Informe 2 de agosto de 2010, págs. 477 y 489; In-forme de 12 de noviembre de 2010, págs. 517 y 532-535; Informe de 20 de diciembre de 2010, págs. 575-605.

 Véase: Informe de 20 de diciembre de 2010, Apéndice de O.A.T., págs. 585-586.

 Apéndice de O.A.T., pág. 396; Informe de 20 de diciembre de 2010, pág. 575.

 Apéndice de O.A.T., Informe 2 de agosto de 2010, págs. 480 y 489; Informe de 12,de noviembre, págs. 519, 532. También se mantuvo la puntuación de Roig. íd., pág. 525. No obstante, su puntuación cambió en el informe del 20 de diciembre de 2010.

 Apéndice O.A.T., Informe de 20 de diciembre de 2010, pág. 604.

 Apéndice del recurso de Bird, págs. 112, 119-120.

 Apéndice de O.A.T., Informe de 20 de diciembre de 2010, pág. 587.

 Apéndice de O.A.T., Informe 2 de agosto de 2010, pág. 481; Informe de 12 de noviembre de 2010, págs. 520, 533; Informe de 20 de diciembre de 2010, pág. 605.

 Apéndice de O.A.T., Informe de Evaluación Técnico, págs. 325-326.

 Apéndice de O.A.T, Informe de Evaluación Técnica, págs. 365-366.

 Apéndice de O.A.T., Informe de Evaluación Técnica, págs. 252-253.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 242.

 Apéndice de O.A.T., Informe de 12 de noviembre de 2010, pág. 534.

 Apéndice de O.A.T., Informe de 20 de diciembre de 2010, pág. 558.

 Apéndice de O.A.T., Informe de 2 de agosto de 2010, págs. 490-491, 483; Informe de 12 de noviembre de 2010, págs. 522-523; Informe de 20 de diciem-bre de 2010, págs. 590, 606-607.

 Apéndice de OAT, Informe de Evaluación Técnica, pág. 367; Informe de 2 de agosto de 2010, pág. 483; Informe de 20 diciembre de 2010, pág. 590.

 Para una discusión detallada de la evaluación de las propuestas de Bird, Roig, Maranello y STZ, véase: Apéndice de OAT, Informe de Evaluación Téc-nica, págs. 253, 294, 329 y 367. Véase, además: Informe de 20 de diciembre de 2010, págs. 547, 549, 552, 556, 558, 560, 562.

 Informe de 20 de diciembre de 2010, págs. 554 y 562.

 Apéndice de O.A.T., pág. 610.

 Apéndice de O.A.T, Informe de Evaluación Técnica, pág. 327.

 Apéndice de O.AT, págs. 363 y 366.

 Apéndice de O.A.T., Informe de 2 de agosto de 2010, pág. 491. Véase, ade-más: Informe de 12 de noviembre de 2010, págs. 534-535; Informe de 20 de diciembre de 2010, pág. 607.

 Apéndice de O.A 21, Informe de Evaluación Técnica, póg. 357.

 Apéndice de O.A.T., Informe de 20 de diciembre de 2010, págs. 604-605. •

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 368.

 Apéndice de O.A.T., Informe de 2 de agosto de 2010, págs. 478-480 488-489; Informe de 12 de noviembre de 2010, págs. 516-520, 531-532; Informe de 20 de diciembre de 2010, págs. 569, 581-585, 603-604.

 Apéndice de O.A.T., págs. 603-604; Informe de 2 de agosto de 2010, pág. 488; Informe de 12 de noviembre de 2010, pág. 532.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 188; Informe de 12 de noviembre de 2010, pág. 522; Informe de 20 de diciembre de 2010, págs. 603-604.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 249; Informe de 2 de agosto de 2010, págs. 478-479; Informe de 12 de noviembre de 2010, págs. 517, 522.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 246.

 Apéndice de O.A.T., Informe de Evaluación Técnica, págs. 242, 249 y 256.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 243.

 En el informe también se especificó que en la propuesta de Bird no aparecía información sobre la protección de fuego. Tampoco sometió el memorial civil, el memorial estructural, el memorial eléctrico o la relación de áreas y uso, entre otras especificaciones. Véase: Apéndice de O.A.T., págs. 249, 250, 255.

 Apéndice de O.A.T., Informe de Evaluación Técnica, págs. 323 y 330.

 Apéndice de O.A.T., Informe de Evaluación Técnica, págs. 324, 330 y 331.

 Apéndice de O.A.T., pág. 489.

 Apéndice de O.A.T., pág. 19.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 246.

 Apéndice del alegato de O.A.T., Informe de Evaluación Técnica, pág. 188.

 Apéndice del alegato de O.A.T., Informe de Evaluación Técnica, págs. 374-375.

 Apéndice de O.A.T., pág. 16.

 Apéndice de O.A.T., Informe de 12 de noviembre de 2010, págs. 520, 536.

 Los argumentos de Maranello en cuanto a la falta de evidencia sobre la posesión del terreno no se incluyeron en la solicitud de reconsideración que presentó en la O.A.T. Es un planteamiento que se hace por primera vez en su recurso de revisión.

 Apéndice de O.A.T., pág. 6.

 Apéndice de O.A.T., pág. 6.

 Apéndice de O.A.T., pág. 10.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 191.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 365.

 Apéndice de O.A.T., Informe de Evaluación Técnica, pág. 372; Informe de 20 de diciembre de 2010, pág. 563.

 Apéndice de O.A.T., Informe de Evaluación Técnica, págs. 328, 372.

 Alegato de la O.AT, págs. 45-46.

 Apéndice de O.A.T., Informe de 12 de noviembre de 2010, pág. 522.

 Apéndice de O.A.T., pág. 526.

 Apéndice de O.A.T., Informe de 12 de noviembre de 2010, pág. 534. Véase, además, Informe de 2 de agosto de 2010, pág. 490; Informe de 12 de noviem-bre de 2010, pág. 522; Informe de 20 de diciembre de 2010, pág. 606.

 Véase Sentencia del Tribunal de Apelaciones, Maranello, Inc.; Bird Interplan Development Group, LLC v. O.A.T., KLRA201100013 y KLRA201100024, págs. 20-65.

 Apéndice de la O.A.T., pág. 372.

 El informe de auditoría DA-12-52 de 19 de marzo de 2012 incluye el periodo auditado correspondiente desde el 1 de julio de 1998 al 30 de junio de 2008. http:// www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-52.pdf.

 El informe de auditoría DA-12-53 de 19 de marzo de 2012 incluye el periodo auditado correspondiente desde el 1 de julio de 1998 al 31 de diciembre de 2007. http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-53.pdf.

 Véase Informe de Evaluación Técnica, Apéndice del Memorando de la O.A.T., págs. 182-375. Véanse, también, los informes del Comité Evaluador para examinar las solicitudes de reconsideración de 2 de agosto de 2010, Apéndice del Memorando de la O.A.T., págs. 473-491; y otro de 12 de noviembre de 2010, Apéndice del Memo-rando de la O.A.T., págs. 514-537; así como los informes y recomendaciones de la Oficina deAsuntos Legales de la O.A.T., págs. 540-611.

 Sobre este señalamiento de error, véase lo discutido en el criterio de calidad y funcionalidad del diseño y construcción, Parte 111(A)(3) de esta sentencia.